## UNTIED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

DEBORAH A. KENSETH,

           Plaintiff,                              Case No. 08-C-1-C

v.

DEAN HEALTH PLAN, INC.,

           Defendant.

## PLAINTIFF'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

The Court of Appeals for the Seventh Circuit vacated this court's grant of summary judgment dismissing Kenseth's breach of fiduciary duty claim and remanded the case "for a determination as to whether Kenseth is seeking any form of equitable relief that is authorized by 29 U.S.C. § 1132(a)(3) and if so, for further proceedings on that claim as are consistent" with the opinion of the Court of Appeals.  (Opinion, p. 65.)

Because the material facts related to Kenseth's breach of fiduciary duty claim are undisputed and the relief sought by Kenseth's second amended complaint is appropriate equitable relief to redress Dean's breaches of its fiduciary duty, summary judgment should be granted on Kenseth's breach of fiduciary duty claim and Kenseth should be awarded the injunctive relief she requests.

### FACTS

The material facts relevant to Kenseth's breach of fiduciary duty claim are not in dispute. These facts are set forth in the proposed findings of fact submitted on behalf of Kenseth in opposition to Dean's previous motion for summary judgment in this case and Kenseth's additional proposed findings of fact submitted in support of her motion for summary judgment.  (See R. 34.)

Deborah Kenseth ("Ms. Kenseth") had been overweight most of her life.  In 1987, she elected to have vertical gastric banding in hopes of reducing her weight.  Her initial surgery was paid for by her employer's health plan.  The surgery was a success and she lost over 120 pounds.  (R. 34, ¶ 1.)

Ms. Kenseth began working for Highsmith Inc. in 1996, and enrolled in their employee health plan when she was first eligible.   She maintained continuous health coverage between 1987 and the present.  Dean Health Plan ("Dean") administered the plan when she joined Highsmith's employee health plan in 1996 and continued to do so until January 1, 2007.  (R. 34, ¶ 2.)

Beginning in 2001, Ms. Kenseth developed a series of illnesses that continued until Dr. Huepenbecker performed a roux revision of proximal gastric stenosis on December 6, 2005.  (R. 34, ¶ 3.) The primary cause of her illnesses between 2001 and 2006 was her gastric stenosis, or a hardening and shrinking of the outlet at the base of her esophagus leading into her stomach.  (R. 34, ¶ 45.)  She developed a severe acid reflux condition that awakened her at night and caused her to vomit repeatedly throughout the day.  (R. 34, ¶ 3.)  She also developed pneumonia on several occasions, suffered significant hair loss, and suffered some erosion in the esophagus.  (*Id.*)  Ms. Kenseth was treated for these illnesses and Dean paid for all of these services.  (R. 34, ¶ 3.)

On September 2, 2004, Ms. Kenseth was admitted to St. Mary's Hospital Medical Center for a "gastroscopy."  Her treating doctor, Abigail M. Christiansen stated in her medical note of September 2, 2004, that Ms. Kenseth's preoperative diagnosis was "persistent vomiting," and her postoperative diagnosis was, "gastric pouch with outlet obstruction status post dilation."  She also stated in her History section that Ms. Kenseth had a vertical banded gastroplasty 17-1/2 years ago.  "She has been vomiting intermittently but now on a daily basis.  She has burning in her esophagus."  (R. 34, ¶ 4.)

2

While in St. Mary's Dr. Christiansen used a balloon to open Ms. Kenseth's outlet.  Dr. Christiansen's impression after surgery stated, "[g]astric outlet obstruction from the vertical banded gastroplasty."  She also noted,

> in terms of erosions in the esophagus, those are likely due to fermentation in the pouch with reflux as it would be difficult to see how any gastric acid could manage to get back into the pouch as snug as that outlet was. . . .  hopefully that will help protect the esophagus from the acids that have been produced. . . . If she has no improvement the possibilities are:  1.  That she needs to be dilated further.  2.  That her stomach no longer can empty regardless of what we do in which case we would have to consider a surgical option.  (R. 34, ¶ 5.)

St. Mary's generated an Outpatient Coding Clinical Summary and Admission Record of Ms. Kenseth's September 2, 2004, procedure.  (R. 34, ¶ 6.)  These records unambiguously stated that Ms. Kenseth's primary diagnosis was digestive system complications and her secondary diagnosis is designated with a DX Code of 5370, "acquired hypertrophic pyloric stenosis, gastric diverticulum, disorder of esophagus, endoscopic dilation of pylorus, upper GI endoscopy including esophagus, stomach."  (R. 34, ¶ 6.)

Dean paid $1,764.10 for all services, treatment, and medications for Ms. Kenseth's September 2, 2004, gastroscopy, a procedure, which was needed to correct a complication of Ms. Kenseth's original gastric banding surgery.  (R. 34, ¶ 7.)

The 2004 plan description regarding covered services related to a non-covered benefit is virtually identical to the 2005 plan.  Both plans provided that "Non-Covered Services" included "any surgical treatment or hospitalization for treatment of morbid obesity."  (R. 34, ¶ 8.)

Dean Health Plan does not have a procedure by which a participant can obtain prior confirmation that a procedure would be covered by their insurance policy when a plan provider will perform the procedure in a plan facility.  Dr. Huepenbecker is a plan provider and St. Mary's is a plan facility.  (R. 34, ¶ 11.)

The 2005 plan and handbook tells participants who have questions regarding benefit coverage to call customer service.  The 2005 handbook has the customer service number printed on the bottom of all 23 pages.  It also notifies participants that no prior authorization or precertification is necessary for a procedure, like Ms. Kenseth's, that is performed by a plan provider in a plan facility.  (R. 34, ¶ 13.)

Dean's written procedure for predetermination of benefits in its 2005 plan and handbook instruct participants with benefit coverage questions to call customer service.  On page one (1) of Dean's 2005 Group Member Certificate and Summary under the title "**IMPORTANT INFORMATION**" and subtitle "IMPORTANT NOTICE CONCERNING STATEMENTS IN YOUR EMPLOYEE APPLICATION AND EMPLOYMENT FORM," it says,

> For detailed information about Dean Health Plan, Inc., or the employer Health Service Agreement, please contact our Customer Service Department at the telephone numbers shown on the cover of this Certificate.  (R. 25, ¶ 7, Exh. B, p. 1; R. 40, ¶ 8, Exh. 7.)

Buried forty (40) pages later in a paragraph in small print is an assertion that oral representations of an employee will not increase or reduce benefits within the policy.  (*Id.*, p. 40.)  The 2005 handbook has the customer service number printed on the bottom of 23 of 28 pages and highlighted on page one (1).  (R. 34, ¶ 13 and R. 40, ¶ 8, Exh. 7.)  It also notifies participants that no prior authorization or precertification is necessary for a procedure, like Kenseth's, that is performed by a Dean provider in a Dean facility.  (R. 34, ¶ 13 and 30; R. 29, pp. 55-56.)

Ms. Kenseth consulted with Dr. Huepenbecker on November 9, 2005.  His medical note described the problem and proposed surgical procedure as follows:

> I discussed options with Deborah.  I told her that basically she has an expected problem after vertical banded gastroplasty that has been more apparent after many years have passed following this procedure.  That problem specifically is stricture at the site of the Marlex band placed to regulate the size of the outlet of the "neo-stomach" created with the VBG.  I told her that I certainly felt that this was amenable

to revision and would simply require conversion to a roux-Y gastrojejunostomy. (R.34, ¶ 14.)

At the conclusion of the November 9, 2005, consultation, Dr. Huepenbecker gave Ms. Kenseth written instructions that included the date of the surgery, the type of surgery, the place at which the surgery would be performed, and the names of the surgeons and her primary physician. (R. 34, ¶ 15.) The form his office gave Ms. Kenseth is routinely used in his office and, as far as he knows, routinely used throughout Dean Clinic for anyone who is going to be hospitalized for surgery at St. Mary's. (*Id.*) The type of surgery described on the form was "Roux revision of proximal gastric stenosis." The instructions also included the following:

> 7.    It is the patient's responsibility to check on coverage whether prior authorization or pre-certification is needed prior to your surgery. It is also the patient's responsibility to check on coverage. Please call your insurance company and let them know the date and type of surgery you are having. If they need further information you may give them your nurse's phone number and they can call with questions.

It was Dr. Huepenbecker's understanding that Dean would provide coverage for a complication to a prior VGB surgery as he believed Dean covered the VGB in the 1980's and 1990's, and therefore, should cover complications in a prospective manner. (R. 34, ¶ 15.)

Consistent with her doctor's directive and the directive in the Plan, Ms. Kenseth called Dean customer service on November 15, 2005. She spoke with representative Maureen Detmer, who had been employed in that capacity for about one year. (R. 34, ¶ 16.)

Ms. Kenseth testified that she told Ms. Detmer that she was having "a Roux-enY stenosis, and she [Ms. Detmer] asked me what that had to deal with, and I said that it had to deal with the bottom of the esophagus because of all the acid reflux that I was having." (R. 34, ¶ 17.) She testified that the conversation lasted 8 minutes and 30 seconds. She was put on hold for a period of it so that Ms. Detmer could consult with another representative. She was informed there was

coverage for the procedure and there would only be a $300 co-pay.  Further, she testified that if she

had been told it would not be covered, she would have looked for other alternatives.  (R. 34, ¶ 17.)

Telephone conversations between participants and customer service representatives about

coverage are not recorded.  (R. 34, ¶ 18.)

After the conversation, Ms. Detmer made a one-sentence note in Dean Health Plan's TRACS

system of Ms. Kenseth's comments during the call.  Specifically, she wrote,

> "pcw 01 calling to advise that she is having op surgery reconstruitive [sic] eshophaus
> [sic] surgery at St. Mary's Hosp on 120605 with Dr. Heupenbecker [sic]."

Additionally, Ms. Detmer documented that she verified benefits and advised Ms. Kenseth

that she would have a $300 co-pay.  (R. 34, ¶ 19.)

Ms. Detmer testified that as a customer service representative she regularly kept a tablet

listing of member calls on which she would take notes of the discussion she had.  She would then rip

off the pages of notes each day and place them in a folder that her supervisor would save.  She could

review a note on a subsequent day but not longer than 30 days as they would then be destroyed.  (R.

34, ¶ 20.)

Ms. Detmer does not have any independent recollection of the November 15, 2005, call with

Ms. Kenseth. (R.34, ¶ 21.)   She was trained not to transfer a call to a supervisor unless the

participant specifically requested it.  (*Id.*)  She further testified that approximately 50% of all calls

she answered were inquiries regarding benefit coverage, and that the only other place a participant

can go to get further information on coverage would be their certificate of coverage.  (R. 34, ¶ 21.)

Ms. Detmer was not trained to tell, and does not tell, plan participants who call with

coverage questions that they cannot rely on her interpretation of the plan participants' schedule of

benefits.  (R. 34, ¶ 22.)

Utilization management nurses, who are forwarded calls by customer service representatives

regarding coverage questions of participants do not routinely tell the member that they cannot rely on the information given as binding. (R. 34, ¶ 23.)

Darcy Paskey, Ms. Detmer's supervisor and Director of Customer Service, testified that it was her understanding that if a customer service representative "caused the member to incur out-of-pocket expense by incorrect information, we review that and provide coverage in some instances." She further clarified that if a participant showed that the customer service representative gave incorrect information prior to the services being obtained and that correct information was not then given to the participant prior to the services being obtained, Dean would cover it. (R. 34, ¶ 24.)

Breheny confirmed that there is no procedure that a doctor or a patient can go through to have confirmation that a surgery will be covered before the patient is admitted to St. Mary's and the procedure is performed. (R. 34, ¶ 30.) She also confirmed that any confirmation of benefits by a customer service representative is not binding on her decision or the decision of the assistant medical director. (*Id.*) Moreover, neither she nor any customer service representative has ever notified a participant like Ms. Kenseth that a determination of benefits by a customer service representative is not binding on the decision to provide coverage for services received. (R. 34, ¶ 30.)


Initially, the decision to grant or deny benefits for Ms. Kenseth's 12/6/05 surgery rested solely within the hands of Dr. Paul Reber, the assistant medical director at Dean who was charged with the duty to review "situations that may arise to determine whether or not they were covered benefits." (R. 34, ¶ 31.)

In making his decision Dr. Reber reviewed Ms. Breheny's note, "can we deny this admission as it is a complication of a noncovered benefit?" Dr. Reber determined that Ms. Kenseth's surgery

was a complication of her 1987 vertical banded gastroplasty, a non-covered procedure, and therefore not a covered benefit.  (R. 34, ¶ 32.)

On December 7, 2005, Dr. Reber decided to deny coverage.  Defendant's rational stated:

Response By DHP:  Dean Health Plan has received information regarding your admission to St. Mary's Hospital for a surgical procedure that is related to a non covered benefit.  Based on the information provided, your admission is denied at this time.  As outlined in your Group Member Certificate and Benefit Summary, please refer to the section Inpatient Hospital:  non covered services, number 5.  Surgical services, non covered services number 4 as well as the General Exclusions and Limitations section, number 28.  Please be aware that complications related to a non covered benefit are excluded from coverage.  Alternatives to consider include paying privately for these services or discussing other options with your physician.  (R. 34, ¶ 33.)

Reber did not know when he made the decision to deny coverage that Ms. Kenseth had been told by customer service representatives that the surgery being performed on December 6, 2005, was covered by the Dean Plan.  (R. 34, ¶ 35.)

Dr. Huepenbecker is a practicing surgeon and is familiar with VBG surgeries.  They were common in the 1980's and 1990's and he believes most insurance providers were paying benefits to participants on patients at that time. (R. 34, ¶ 50.)

It is Dr. Huepenbecker's recollection that in the late 1980's, Dean Health Plan did routinely cover VBG surgery for his patients.  (R. 34, ¶ 51.)   At the time Dr. Huepenbecker performed surgery on Ms. Kenseth on December 6, 2005, she was not morbidly obese.  (R. 34, ¶ 52.)  It is Dr. Huepenbecker's understanding that Dean Health Plan would provide coverage for a complication to a prior VBG surgery as he believes Dean covered the VBG in the 1980's and 1990's and therefore should cover complications in a prospective manner. (R. 34, ¶ 53.)

If the customer service representative had told Ms. Kenseth that the Plan did not provide coverage for the procedure scheduled for December 6, 2005, Ms. Kenseth would have looked at other alternatives and not had the surgery.  (R. 34, ¶ 37.)

The surgery performed by Dr. Huepenbecker on December 6, 2005, was the most effective treatment for Ms. Kenseth's conditions.  However, she could have continued the treatments she had been receiving and had the surgery at a later date.  (R. 34, ¶ 40.)

It is undisputed that after Kenseth's surgery was performed, Dean denied coverage for the surgery, hospitalization, and subsequent care for treatment of complications arising from the surgery.

Some but not all doctors within the Dean system are part owners of Dean Health Systems, Inc.  (Plaintiff's Additional Proposed Findings of Fact (hereafter PAPFF), ¶ 6.)  Dean has contractual agreements with various providers for payment of charges for medical services covered by the Dean plan.  Pursuant to those agreements, Dean pays a contractually agreed upon payment rate for covered services.  The discount for Dean's payment of covered services can be approximated.  (PAPFF, ¶ 7.)  Dean admits that some of the unpaid charges Ms. Kenseth owes are charges made by SSM Health Care of Wisconsin for uncovered services provided at St. Mary's Hospital and some are for charges from Dean Health Systems, Inc. for uncovered services provided by Dean physicians and clinics.  Dean's parent corporation is Dean Health Insurance, Inc. which is owned 53% by Dean Health Systems, Inc. and 47% by SSM Health Care Corporation, meaning Dean, the defendant herein is owned by the entities seeking payment from Kenseth for the surgery and follow up treatment at issue in this case.  (PAPFF ¶8.)  Dean estimates that the charges by Dean providers for Kenseth's treatment and care between December 6, 2005, and December 31, 2006 for complications that trace back to her gastric bypass surgery was $86,319.95.  (PAPFF ¶ 9.)  Dean estimates that it would have paid about $35,803.12 for such services had they been covered by the 2005 and 2006 Dean policies under which Kenseth was a subscriber.  (PAPFF ¶ 9.)

Dean has a contractual arrangement for services at St. Mary's Hospital which is owned and operated by SSM Health Care of Wisconsin, and with Dean Health Systems, Inc. with which many

of Ms. Kenseth's providers in 2005 and 2006 were affiliated.  (PAPFF ¶ 1.)  Dean is owned 100%

by Dean Health Insurance, Inc. which in turn is owned 53% by Dean Health Systems, Inc and 47%

by SSM Health Care Corporation.  (PAPFF ¶ 2.)  Dean Health Systems, Inc is a 450 plus member

physician multi-specialty group practicing in Dane County and the same 18-county extended service

area as SSM Health Care of Wisconsin.  (PAPFF ¶ 3.)  SSM Health Care Corporation, has a 5%

interest in Dean Health Systems, Inc.  (PAPFF ¶ 4.)  St. Mary's Hospital is a facility owned and

operated by SSM Health Care of Wisconsin.  (PAPFF ¶ 5.)

## ARGUMENT

ERISA was designed to protect the interest of participants and beneficiaries of employee

benefit plans by establishing standards of conduct, responsibility, and obligations for fiduciaries,

29 U.S.C. § 1001(b), and by "invoking the common law of trusts to define the general scope of"

these duties.  Central States, Southeast & Southwest Areas Pension Fund v. Central Transp. Inc.,

472 U.S. 559, 570 (1985)(citations omitted).  At the core of ERISA's fiduciary obligations are

the familiar trust-law duties of loyalty and prudence which are among the "highest known to the

law."  Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2nd Cir. 1982).

ERISA provides enforcement of its stringent fiduciary duties and other requirements

through a number of "carefully integrated" remedial provisions. Massachusetts Mut. Life Ins.

Co. v. Russell, 473 U.S. 134, 146 (1985). This case concerns one of those provisions, ERISA

section 502(a)(3), which allows a participant, beneficiary, or fiduciary to sue "to enjoin any act

or practice which violates" ERISA or "to obtain other appropriate equitable relief . . . to redress

such violations." That provision is designed as a "catchall" that "act[s] as a safety net, offering

appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere

adequately remedy." Varity Corp. v. Howe, 516 U.S. 489, 512 (1996).

The Seventh Circuit Court of Appeals has already held that Dean breached its fiduciary duty to Kenseth in this case.  Kenseth v. Dean Health Plan, Inc., 610 F.3d 452, 456 (7th Cir. 2010), hereafter "Opinion."  (Opinion, p. 2.)  A claim for breach of fiduciary duty under ERISA requires the plaintiff to prove: (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff. Kannapien v. Quaker Oats Co., 507 F.3d 629, 639 (7th Cir. 2007). ERISA authorizes an award of equitable relief to a plan participant suing on her own behalf for breach of fiduciary duty. See Great-West Life & Annuity Ins. Co v. Knudson, 534 U.S. 204, 210, 122 S. Ct. 708, 712-13 (2002).

Kenseth is now asking that this court grant her summary judgment consistent with the Seventh Circuit Court of Appeals decision holding Dean breached its fiduciary duty to Kenseth, and to award her the appropriate equitable relief she has requested in her Second Amended Complaint.

## I.   KENSETH IS ENTITLED TO SUMMARY JUDGMENT ON HER BREACH OF FIDUCIARY DUTY CLAIM.

### A.  Dean Breached Its Fiduciary Duty to Provide Complete and Accurate Information In The Written Plan Documents And In Adequately Training Its Customer Service Representatives.

The law applicable to Kenseth's breach of fiduciary duty claim is set forth in the opinion of the Court of Appeals.  It is undisputed that Dean is a plan fiduciary and that Kenseth has been harmed by Dean's failure to provide coverage for the services at issue in this case.  Further, as noted by the Court of Appeals,

> The facts support a finding that Dean breached its fiduciary duty to Kenseth by providing her with a summary of her insurance benefits that was less than clear as to coverage for  her surgery, by inviting her to call its customer service representative with questions about coverage but failing to inform her that whatever the customer service representative told her did not bind Dean, and by failing to advise her what alternative channel she could pursue in order to obtain a definitive determination of coverage in advance of her surgery.

11

Kenseth, 610 F.3d 452, 456.

"The duty to disclose material information is at the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." Id. at 466.  The duty includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan and includes an affirmative obligation to communicate material facts affecting the interest of beneficiaries. Id.  The parameters of these obligations are elaborated in the court's opinion. Id. at 466-483.  Included are the requirements that plan documents themselves are clear, and that the fiduciary take reasonable steps in furtherance of an insured's right to accurate and complete information. Id. at 468-71.  The later requirement includes taking appropriate precautions such as training the benefits staff so that incorrect, misleading, and erroneous advice are not provided to participants by plan representatives. Id. at 471-72.

The court held:

> Kenseth's claim, which is premised on the ambiguity of the Certificate and on Dean's lack of care in training the customer service representatives from whom it has encouraged plan participants to seek coverage information, describes a type of fiduciary negligence that these cases recognize as actionable.

Id. at 470.[1]

The Court of Appeals held the language of Dean's member certificate ambiguous with regard to the exclusion of coverage for Kenseth's surgery stating:

> …we reject the notion that it would have been clear to the average reader of the Certificate that the plan excluded coverage for any medical services aimed at resolving complications resulting from an earlier surgical procedure for

---

1 In addition the Court held on p. 39 of its opinion that:
> Kenseth's claim, as we shall see, fits within these parameters.  Her claim is not based on the simple premise that Detmer gave her inaccurate advice as to the coverage for her Roux-en-Y procedure.  It is based instead upon Dean's failure, both in writing the Certificate and in training Detmer and its other customer service agents, to ensure that plan participants received complete and accurate information.

morbid obesity, however long ago that procedure may have taken place.

*Id*. at 474.  The Court also found that the certificate was unclear in another respect:

>…it does not identify a means by which a participant or beneficiary may obtain an authoritative determination as to whether a particular medical service will be covered by the plan.

*Id*. at 476.

Whether a contract is ambiguous, as well as the meaning of an unambiguous contract, are, of course, questions of law.  The interpretation of a contract is a question of law which the Court of Appeals reveals de novo.  In the Matter of Century Investment Fund VIII Limited Partnership, 937 F.2d 371, 376-377 (7th Cir. 1991).  Thus, the issue regarding the ambiguity of the language of the member certificate is settled by the opinion of the Court of Appeals.  Kenseth, 610 F.3d 452, 456.

The Court held that Kenseth's claim also fit within the parameters of a breach of fiduciary duty claim because Dean failed to adequately train customer service representatives to insure participants received complete and accurate information particularly in light of the written plan's ambiguities.  Kenseth alleged Dean failed to take reasonable steps to insure participants like herself understood they could not rely upon the coverage advice of its customer service representatives; that the member certificate urges participants with doubts about coverage to call Dean's customer service line "prior to having the service performed;" and that if there was a method for obtaining a benefits determination in advance of treatment it was not communicated to Kenseth.  *Id*. at 472-74.  The Court interpreting the language of the member certificate, held:

>We shall therefore assume that it was possible for a participant in the Dean plan to obtain a benefits determination in advance of treatment.  But as should be evident from the following discussion, whether such advance determinations were or were not available from Dean, the critical omission on Dean's part was its failure to communicate that information to Kenseth.

*Id*. at 473.  This holding, like the court's holdings regarding the ambiguities in the plan's language,

is the law of this case.

Clearly, Dean failed to take steps to insure participants like Kenseth understood they could not rely on the advice of Dean's customer service representatives.  Dean not only permitted but encouraged participants to call its customer service line with questions about whether particular medical services were covered by the plan.  *Id*. at  469. Dean clearly understood that callers like Kenseth were seeking to determine in advance whether forthcoming medical treatments would or would not be paid for by Dean.  *Id*. at 469.  Yet, Dean did not train its customer service representatives to advise callers they could not rely upon the information they were provided or how to obtain definitive advice.  Therefore callers were not warned that they could not rely on the advice that they were given by Dean's customer service representatives and that Dean might later deny claims for services that callers had been told would be covered.  *Id*. at 469, 478.  Nor were callers advised of a process by which they could obtain a binding determination as to whether forth coming services would be covered.  *Id*. at 469.  And, the plan itself, failed to inform callers they could not rely on the advice of the customer service representatives.  *Id*. at 478.  By supplying participants with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions.  *Id*. at 472.

The Court of Appeals analyzed the evidence presented by the parties relevant to the motion for summary judgment to determine whether it presented a triable question of fact as to whether Dean breached its fiduciary obligations to Kenseth and found it did.  *Id*. at 473-481.  The Court noted that "many if not most of the facts concerning the alleged breach of fiduciary duty appear to be undisputed and might have entitled Kenseth to at least partial summary judgment on this claim."  *Id*. at 483.  The Court left the necessity of a trial on the merits of the claim to be sorted out on remand because Kenseth had not filed a cross motion for summary judgment and therefore, did not

place Dean on notice of that possibility. *Id.*

Notably, the material facts relevant to Kenseth's breach of fiduciary duty claim are not in dispute. The language in the plan concerning coverage of Kenseth's surgery was ambiguous. The language in the plan regarding what participants should do to obtain information was misleading and did not provide complete and accurate information. Neither the plan nor the customer service representatives warned participants that they could not rely upon the advice they received from the customer service representatives they were repeatedly encouraged to call. Thus, summary judgment should be granted for Kenseth on her breach of fiduciary duty claim.

**B. Dean Breached Its Fiduciary Duty By Failing To Provide A Method By Which A Participant Could Obtain Confirmation of Coverage For Non-Emergency Treatment.**

It is undisputed that there was no method by which Kenseth could obtain confirmation of coverage for her surgery because it was performed by a Dean provider in a Dean facility. (R. 34, ¶11.) The Court of Appeals did not decide whether Dean had a duty to advise Kenseth in advance of treatment whether it would cover the cost of the treatment. *Id*. at 472. The court noted:

> Our decisions have observed generally that an insurer bears no duty to provide an advisory opinion to every beneficiary based on his or her unique circumstances. *E.g., Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997). On the other hand, where one is seeking medical treatment on a non-emergency basis, there is a logical need to know in advance whether his or her insurer will cover that treatment and to plan accordingly. Upon learning that his or her insurer will not cover a particular treatment, one may elect to pursue an alternative treatment which will be covered, to obtain different coverage (e.g., through one's spouse) which will cover the treatment, or, if there is no coverage available, forego or delay treatment or seek treatment in a less costly setting.

*Id.* at 472-73. The Court also noted that at least two courts have concluded that a health insurer does have a good faith duty to advise its insured in advance of treatment whether it deems a particular treatment to be medically necessary such that it will be covered. *See* <u>State Farm Mut. Auto. Ins. Co. v. Gueimunde</u>, 823 So. 2d

141, 144 (Fla. Dist. Ct. App. 2002); Eggiman v. Mid-Century Ins. Co., 895 P.2d 333,

335-37 (Or. Ct. App. 1995) (citing McKenzie v. Pacific Health & Life Ins. Co., 847

P.2d 879, 881 (Or. Ct. App. 1993)).  Kenseth, 610 F.3d 452, 473.

> Dean is an ERISA fiduciary and therefore, as the Court of Appeals noted:

> Dean is obliged to carry out its duties with respect to the plan "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of:   (i) providing benefits to participants and their beneficiaries;…[and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims…." 29 U.S.C. § 1104(a)(a).

Id. at 465.

As the Court of Appeals noted, the relationship between Dean and plan participants is not an

"arms length relationship." Id. at 480.  Dean was a fiduciary, and in that capacity it owed Kenseth a

duty to administer the plan solely in her interest, not its own.  Id.  Providing participants a method to

determine in advance whether there is coverage for non-emergency treatment is critical to protecting

the participant's interest.

The complexity of the typical group health policy including Dean's and the difficulties they

present the average insured navigating through the policy trying to determine the extend and scope

of coverage were recognized by the Court of Appeals.  Id. at 473-78, 476 n.9.  The Court noted that

instead of providing Kenseth with a method, other than calling a customer service representative, to

seek a coverage determination the plan left her and other participants "to guess as to how they may

obtain coverage information that they can rely on, and for that matter whether they need to do so."

Kenseth, 610 F.3d 452, 479-80.

The need for a reliable method for determining coverage of non-emergency treatment is

apparent.   It would not impose a significant burden on Dean to provide such a procedure.

Interestingly, Dean claims to have provided their providers with just such a mechanism.  See *Id*. at 473, noting:

> Indeed, Dean's response below to Kenseth's proposed facts also disputed her assertion that there was no such procedure; Dean cited testimony suggesting that medical personnel, at least, could obtain authoritative determinations regarding coverage in advance of treatment.  R. 42 ¶¶ 11, 30; *see* R. 27 (Breheny Dep.) at 44, 48-49 (noting that doctors occasionally call Dean's customer service line seeking coverage information, but adding that there is no official procedure for obtaining binding coverage advice in advance of treatment).

If Dean can implement a mechanism by which its providers can obtain a determination of coverage to protect their interest in being paid for the procedures they perform, it should be required to afford participants the same opportunity to protect their interest in not becoming responsible for the cost of the procedure after being told there was coverage.  The court should find that ERISA's fiduciary duty of loyalty and prudence requires Dean to do so and that Dean breached its fiduciary duty by failing to do so.

For the forgoing reasons, the Court should grant summary judgment for Kenseth on her breach of fiduciary duty claim based on Dean's failure to provide a method for confirming coverage prior to receiving non-emergency treatment.

## II.        KENSETH IS ENTITLED TO APPROPRIATE EQUITABLE RELIEF.

Section 502(a)(3) authorizes a civil action:

> By a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates. . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan.

29 U.S.C. § 1132(a)(3).  As explained in <u>Mertens</u> "equitable relief must mean something less than all relief."  508 U.S. at 258, n.8.  The term equitable relief in § 502(a)(3) must refer to "those categories of relief that were typically available in equity. . . ."  <u>Id</u>., at 256.

**A.** **Kenseth Is Entitled To An Injunction Restraining Dean's Breach Of Its Fiduciary Duty.**

The Seventh Circuit Court of Appeals has already determined that Dean's plan is ambiguous because it did not (1) advise participants under what circumstances services related to non covered services are also not covered; (2) it did not provide information about whether or not a participant could obtain a binding decision on coverage before costs were incurred; and (3) it did not inform participants that customer services representatives' assertions of coverage are non-binding.   An injunction should be granted enjoining Dean's acts and practices that violated ERISA and gave rise to the breach of fiduciary duty.  29 U.S.C. § 1132(a)(3) provides for equitable relief to redress the violation of law.  Injunction is inherently an equitable remedy.  See, e.g., Reich v. Continental casualty Co., 33 .3d 754, 756 (7th Cir. 1994); 1 D. Dobbs, Law of Remedies § 1.2, p. 11 (2d ed. 1993).

Kenseth's second amended complaint requests that the injunction require Dean to:

a.      cure the ambiguity in the summary plan description which directs plan participants to the appropriate procedure by which a participant can obtain a binding coverage determination prior to incurring the costs of care.

b.      cure the ambiguity in the summary plan description which states under what circumstances services related to non covered services are also not covered in light of the Seventh Circuit Court of Appeals decision determining the plan's ambiguity as to whether or not Kenseth's care is a covered benefit under the plan given that her prior banding surgery in 1987 was a covered benefit under her prior employer's health insurance plan.

c.      amend the certificate to state that statements made by customer representatives about coverage for a procedure are not binding on Dean and that Dean can deny claims that callers were told were covered.

d.      train customer service representatives to inform individuals calling with coverage questions that statements made by customer representatives about coverage for a procedure are not binding on Dean and that Dean can deny claims that callers were told were covered.

(R. 59, p. 10, ¶68.)

An injunction requiring Dean to take the requested actions to redress its ERISA violation and enjoin its acts and practices that constituted the breach of fiduciary duty is appropriate equitable relief specifically authorized by 29 U.S.C. § 1132(a)(3) as an equitable remedy.

### B. Kenseth Is Entitled To An Injunction Requiring Dean To Implement A Procedure For Obtaining A Binding Determination About Coverage For Non-Emergency Procedures or Treatment.

Kenseth's second amended complaint requests an injunction requiring Dean to:

e.      implement a procedure by which individuals with coverage questions regarding non-emergency procedure or treatment can receive a binding determination whether there is coverage for the procedure or treatment.

f.      amend the Plan to clearly describe that a participant seeking a non-emergency procedure or treatment can receive a binding coverage determination before costs are incurred.

(R. 59, pp. 10-11, ¶ 68.)

As noted previously, this court should find that Dean breached its fiduciary duty by not providing participants a procedure for obtaining confirmation of coverage of elective procedures in advance.  Thus, an injunction requiring Dean to implement such a procedure is appropriate equitable relief.

**C.    Kenseth Is Entitled To An Injunction Requiring Dean To Hold Her Harmless For The Cost Of Her Surgery And Treatment Or In the Alternative Hold Her Harmless For Any Costs In Excess Of The Amount Dean Would Have Paid If The Surgery And Treatment Had Been Covered.**

Kenseth seeks equitable relief requiring Dean to hold her harmless for all or at least a portion of the claims of Dean's providers.  It is well established that equitable relief is appropriate to prevent a wrongdoer from benefitting from the wrongdoing.  Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-265 (1946).  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created"; First Nat. Bank of Colorado v. McGuire, 184 F.2d 620, 627 (7th Cir. 1950).  "A wrongdoing trustee should not profit by his wrong, and a wronged cestui should be made whole by the wrongdoer.  No principle is more settled than that a trustee will not be allowed to profit out of his administration of a trust."  See also Black v. TIC Investment Corp., 900 F.2d 112 (7th Cir. 1990.)

Injunctive relief requiring Dean to hold Kenseth harmless for the costs resulting from her surgery is appropriate in order to prevent Dean and its owner providers from benefiting from Dean's breach of fiduciary duties.

Dean Health Plan is owned 100% by Dean Health Insurance, Inc. which in turn is owned 53% by Dean Health Systems, Inc and 47% by SSM Health Care Corporation.  (PAPFF 2.)  Dean Health Systems, Inc. is a 450 plus member physician multi-specialty group practicing in Dane County and the same 18 County extended service area as SSM Health Care of Wisconsin.  (PAPFF 3.)  SSM Health Care Corporation has a 5% interest in Dean Health Systems, Inc. (PAPFF 4.)  St. Mary's hospital is a facility owned and operated by SSM Health Care of Wisconsin.  (PAPFF 5.)

Dean admits, on information and belief, that some of the unpaid charges Ms. Kenseth owes are charges made by SSM Health Care of Wisconsin for uncovered services provided at St. Mary's Hospital and some are for charges by Dean Health Systems, Inc. for uncovered services provided by

Dean physicians and clinics.  (PAPFF 8.)   At a minimum Dean should hold Kenseth harmless for the charges attributed to parties that own a portion of defendant herein, Dean Health Plan.

Additionally, Dean has contractual agreements with various providers for payment of charges for medical services covered by Dean.  Pursuant to those agreements, Dean pays a contractually agreed upon payment rate for covered services.  The discount for Dean's payment of covered services can be approximated.  (PAPFF 7.)  Dean estimates that the charges by Dean providers for Kenseth's treatment and care between December 6, 2006 and December 31, 2006 for complications that trace back to her gastric bypass surgery was $86,319.95.  (PAPFF 9.)  Dean estimates that it would have paid about $35,803.12 for such services had they been covered by the 2005 and 2006 Dean policies under which Kenseth was a subscriber.  (PAPFF 9.)

The equitable relief authorized by 29 U.S.C. § 1132(a)(3), as the Court of Appeals noted, includes "those categories of relief that were typically available in equity."  Kenseth, 610 F.3d 452, 482.  Injunctions, mandamus, and restitution are among those categories of relief. Id.  Kenseth seeks such relief.

There are no cases discussing whether equitable relief preventing a wrongdoer from benefitting from the wrongdoing is "appropriate equitable relief" authorized by 29 U.S.C. § 1132(a)(3).  Requiring Dean to hold Kenseth harmless is particularly appropriate because the amounts Dean's owner providers are seeking from Kenseth are approximately $50,516.83 greater than the amount Dean would have paid the providers if the procedures were covered as Dean told Kenseth.  Therefore, those providers, who also have a shareholder, ownership, or interest in Dean, would be unjustly enriched as a result of Dean's breach of fiduciary duty and in turn Dean would be unjustly enriched, unless Dean is required to hold Kenseth harmless for those charges in full or at a minimum for the amounts in excess of what Dean would pay those providers.

21

Monetary relief in the form of restitution may be considered equitable, and thus may be sought in an ERISA action for "other appropriate equitable relief" if it does not impose personal liability on the defendant, but is sought to restore to the plaintiff particular funds or property in the defendant's possession.  Calhoon v. Trans World Airlines, Inc., 400 F.3d 593, 596-97 (8th Cir. 2005); Mondry v. American Family Mutual Insurance Company, 557 F.3d 781, 806 (7th Cir. 2009). Thus, when a party overpays and sues under ERISA to recover the specific amount that was over paid into a particular account, the amount can be recovered not because of the plaintiff's economic loss but to punish the wrong-doer by taking his ill-gotten gains.  Id.  If restitution was not required, the wrongdoer would be unjustly enriched.

The circumstances in this case are closely analogous to those in the unjust enrichment restitution cases.  Dean acknowledges its contractual relationship with the providers of Kenseth's care who also have an ownership interest in the plan, which included an agreement with each provider to accept as full payment for covered services less than the full amount otherwise charged for those services.  (PAPFF 7 and 9.)  Dean estimates it would have paid $35,803.12 of the $86,319.95 Dean believes its providers charged for the medical services Kenseth received between December 6 and 31, 2005.  (PAPFF 9.)  Thus, Dean's providers seek to benefit in the amount of $50,516.83 over and above what it would have received as a result of Dean's breach of its fiduciary duty.

Kenseth requested Dean provide a copy of its contracts with its providers who provided Kenseth's care and Dean has objected to providing those contracts because of confidential provisions.  (Goldman Aff. Exh. 1, pp. 19, 20, Response to Request for Production of Documents No. 9.)  Dean, however, has not asserted that those contracts prevent Dean from requiring those providers to accept only the amount they would have received had Dean decided the services were in

fact covered by the plan, as Dean told Kenseth.   Further, Dean has not asserted it does not have the ability based on those contracts to ensure Kenseth is not financially responsible for the uncovered services.

Without hold harmless order Dean providers, who are also owners of Dean, would be unjustly enriched because of Dean's breach of its fiduciary duty and as well as the provider's own failure to utilize contractually provided procedures for determining whether there was coverage for Kenseth's surgeries.

Kenseth like the plaintiff in <u>Mondry v. American Family Mutual Insurance</u>, 557 F.3d 781 (7th Cir. 2009), is complaining of a breach of trust.  The providers of her medical services were owners of the plan and Dean providers.  Dean and these providers were parties to contractual agreements for the delivery of health care services which Dean contracted to furnish.

The amount Dean would be obligated to pay its providers if Kenseth's treatment was covered as Kenseth was told is significantly less than the amount the provider would receive from the insured if the service was not a covered service.  In this case, Dean providers are seeking compensation from Kenseth for treatment in excess of the amount they would have been paid by Dean if the service was a covered service.  Thus, Dean providers are seeking to be unjustly enriched as a result of Dean's breach of its fiduciary duty.  Moreover, Dean's providers, as admitted by Dean could have sought confirmation of coverage pursuant to their contractual agreement with Dean, but chose to put the onus on Kenseth to do so.   Ordering Dean to hold Kenseth harmless prevents Dean's unjust enrichment for any misunderstanding of information Dean provided its providers of care regarding covered services contained in their contracts.

Appropriate equitable relief should include an order that Dean prevent its providers, who have an ownership interest in Dean, from being unjustly enriched as a result of Dean's breach of

fiduciary duty.  Dean obviously had the ability to do so in its contractual agreements with its

providers.  As the court observed in *Mondry:*

> What matters, in our view, is that American Family contracted with CIGNA
> to handle claims administration as its agent, and if American Family did not
> include in the contract a provision entitling it to copies of any documents that
> might be covered by section 1024(b)(4), it certainly could have done so.

Mondry v. American Family Mutual Insurance, 557 F.3d 781 (7th Cir. 2009)  Dean likewise could

have required its providers to hold participants entirely harmless for Dean's coverage mistakes and

most assuredly for amounts in excess of what the providers would have been paid if in fact the

treatment they provided as a result of Dean's breach of its fiduciary duty were covered.

### D.  Kenseth Is Entitled To An Injunction Requiring Dean To Provide Her The Same Relief the Plan Provided to Other Participants Who Were Mistakenly Informed There Was Coverage When In Fact The Plan Did Not Provide Coverage.

In the second amended complaint Kenseth asks the court to (1) order defendant to honor their

policy of covering the costs of medical expenses incurred when a customer service representative

tells a participant that the upcoming procedures or services will be covered prior to costs incurred

when in fact defendant determines the services should not be covered; and (2) order defendant to

honor their policy of covering the costs of medical expenses incurred when Dean mistakenly

misleads a participant in light of the Seventh Circuit Court of Appeals decision stating Dean

breached its fiduciary duty to plaintiff by failing to have a proper procedure by which she could

obtain a binding coverage decision before costs were incurred.  (R. 59, p. 12, ¶ 68.)

Kenseth's requests that given Dean's breach of its fiduciary duties Dean provide Kenseth with

the same relief it provides other participants who receive treatment based upon misinformation by

customer service representatives.  Darcy Paskey, Director of Customer Service, testified that it was

her understanding that if a customer service representative "caused the member to incur out-of-

24

pocket expense by incorrect information, we review that and provide coverage in some instances." (R. 34, ¶ 24.)   She further clarified that if a participant showed that the customer service representative gave incorrect information prior to the services being obtained and that correct information was not then given to the participant prior to the services being obtained, Dean would cover it.  (R. 34, ¶ 24.)

The Court of Appeals stated that it believed the fact that Dean on occasion has provided coverage when a member has incurred medical expenses in reliance on mistaken advice she has been given by a customer service representative "has any material bearing on the legal issues presented in this case."  Kenseth, 610 F.3d 452, 461.  The legal issues before the Court were whether Dean breached its fiduciary duty, was estopped from denying coverage, or violated state law.  Not before the Court at the time was the appropriate equitable remedy for the alleged breach of fiduciary duty.  This is a question of remedy rather than an issue over a substantive violation of the law.  Dean breached its fiduciary duty to Kenseth and thereby caused her harm.  How Dean treats other participants suffering similar harm is relevant to the appropriate equitable relief.  Therefore, this court should order as an equitable remedy that Dean honor its tradition of providing coverage when a participant incurs an out-of-pocket cost due to Dean's provision of misinformation and that misinformation is not corrected before costs are incurred.  Dean had almost three weeks in which to correct the misinformation provided to Kenseth but did not do so.

## CONCLUSION

For the above stated reasons summary judgment should be granted affirming the Seventh Circuit Court of Appeals decision that Dean breached its fiduciary duty to Kenseth, and order the equitable relief requested including modification of the plan documents, modification of training customer service representatives receive, holding Kenseth harmless for the costs incurred due to

Dean's breach of its fiduciary duty, and honoring its policy of providing coverage when Dean provides misinformation and does not correct the mistake before costs are incurred by a participant. Further, Kenseth requests costs and attorneys fees as provided by law.

      Dated:  November 15, 2010

LAWTON & CATES, S.C.
Attorney for Plaintiff Deborah A. Kenseth


 /s/ Lisa C. Goldman
Lisa C. Goldman, SBN:  1029893

10 E. Doty Street, Suite 400
P.O. Box 2965
Madison, WI 53701-2965
(608) 282-6200 – Telephone
(608) 282-6252 - Facsimile
lgoldman@lawtoncates.com